**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JESSICA NGUYEN**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:20-cv-00718 (APM)** |
| | ) | |
| **U.S. DEPARTMENT OF** | ) | |
| **HOMELAND SECURITY**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**GOVERNMENT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

FACTS AND RELEVANT BACKGROUND ........................................................3

    1.      The COVID-19 Pandemic and the COVID-19 Labor Proclamation ................3

    2.      Procedural Background ...........................................................................7

STANDARD OF REVIEW ...................................................................................10

ARGUMENT ........................................................................................................12

    1.      Plaintiffs do not have standing to proceed...........................................12

    2.      Plaintiffs failed to state a claim under the APA (Counts I, V, and VI)...........18

    3.      Plaintiffs fail to state a claim that the COVID-19 Labor Proclamation is *ultra vires* (Count IV)...........................................................................22

    4.      As a matter of law, Plaintiffs fail to state a claim for a procedural due process violation under the Fifth Amendment (Count III)............................22

            a.      As a matter of law, Plaintiffs fail to identify any constitutionally liberty or property interest protected by the Due Process Clause of the Fifth Amendment...........................................................31

            b.      Alternatively, Plaintiffs fail to state a procedural due process claim, because they cannot identify any additional process that they were entitled to receive.................................................36

    5.      As a matter of law, Plaintiffs fail to state a Fifth Amendment claim for equal protection (Count II) ...................................................................38

CONCLUSION ....................................................................................................43

CERTIFICATE OF SERVICE .............................................................................44

# TABLE OF AUTHORITIES

## CASE LAW

*Abourezk v. Reagan*,
  785 F.2d 1043 (D.C. Cir. 1986), *aff'd by an equally divided Court*, 484 U.S. 1 (1987) .......... 28

*Al-Aulaqi v. Obama*,
  727 F. Supp. 2d 1 (D.D.C. 2010) ................................................................................. 34

*Allen v. Milas*,
  896 F.3d 1094 (9th Cir. 2018) ............................................................................... 19, 20

*Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*,
  642 F.3d 1137 (D.C. Cir. 2011) ................................................................................. 11

*Amer. Mfrs. Mut. Ins. v. Sullivan*,
  526 U.S. 40 (1999) .................................................................................................. 31

*Ark Initiative v. Tidwell*,
  749 F.3d 1071 (D.C. Cir. 2014) ....................................................................... 13, 15, 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... *passim*

*Ass'n of Admin. Law Judges v. U.S. Office of Pers. Mgmt.*,
  640 F. Supp. 2d 66 (D.D.C. 2009) ............................................................................ 23

*Baan Rao Thai Rest. v. Pompeo*,
  No. 19-cv-58, 2019 WL 3413415 (D.D.C. July 29, 2019) ........................................... 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................... 11, 12

*Bender v. Williamsport Area Sch. Dist.*,
  475 U.S. 534 (1986) ................................................................................................. 10

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................... 24, 25

*Block v. Community Nutrition Inst.*,
  467 U.S. 340 (1984) ................................................................................................. 19

*Browning v. Clinton*,
    292 F.3d 235 (D.C. Cir. 2002) ................................................................. 12, 18, 19, 25

*Butera v. District of Columbia*,
    235 F.3d 637 (D.C. Cir. 2001) ................................................................. 34, 35

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ................................................................. 3, 38, 39

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................. 13, 14

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................................. 18

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
    189 F. Supp. 3d 85 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017),
    *opinion amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018), *as amended on denial*
    *of reh'g* (Mar. 6, 2018) ................................................................. 21, 22

*Doe #1 v. Trump*,
    944 F.3d 1222 (9th Cir. 2019) ................................................................. 29

*Doe v. Trump*,
    418 F. Supp. 3d 573 (D. Or. 2019) ................................................................. 28, 29

*Doe #1 v. Trump*,
    No. 3:19-CV-1743-SI, 2020 WL 2061775 (D. Or. Apr. 29, 2020) ................................................................. 29

*Doe v. U.S. Dep't. of Justice*,
    753 F.2d 1092 (D.C. Cir. 1985) ................................................................. 31

*Emami v. Nielsen*,
    365 F. Supp. 3d 1009 (N.D. Cal. 2019) ................................................................. 33

*Escobar v. I.N.S.*,
    700 F. Supp. 609 (D.D.C. 1988) ................................................................. 34, 35

*Farm Econ. v. U.S. Dep't of Agric.*,
    876 F.2d 994 (D.C. Cir. 1989) ................................................................. 40

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ................................................................. 40

*Fiallo v. Bell,*
  430 U.S. 787 (1977) ........................................................................................... 32, 37

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ............................................................................... 2, 18, 24, 25

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
  460 F.3d 13 (D.C. Cir. 2006) ...................................................................... 23

*Gebhardt v. Nielsen,*
  879 F.3d 980 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 330 (2018) ......... 33, 35, 36, 37

*Gen. Elec. Co. v. Jackson,*
  610 F.3d 110 (D.C. Cir. 2010) .................................................................... 31

*Grand Lodge of the Fraternal Order of Police v. Ashcroft,*
  185 F. Supp. 2d 9 (D.D.C. 2001) ............................................................... 11

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) ................................................................................... 32

*Hazama v. Tillerson,*
  851 F.3d 706 (7th Cir. 2017) ...................................................................... 32

*Hettinga v. United States,*
  677 F.3d 471 (D.C. Cir. 2012) .................................................................... 40

*Humane Soc'y v. Vilsack,*
  797 F.3d 4 (D.C. Cir. 2015) .................................................................. 11, 12

*People for Ethical Treatment of Animals, Inc. v. Perdue,*
  No. CV 18-1137-TFH, 2020 WL 2800995 (D.D.C. May 29, 2020) ........... 10, 13, 18

*Indep. Equip. Dealers Ass'n v. E.P.A.,*
  372 F.3d 420 (D.C. Cir. 2004) ............................................................... 23, 24

*International Refugee Assistance Project v. Trump,*
  --- F.3d ---, 2020 WL 3039029 (4th Cir. June 8, 2020) ...................... 41, 42

*Jensen v. Nat'l Marine Fisheries Serv.,*
  512 F.2d 1189 (9th Cir. 1975) .................................................................... 21

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950) ........................................................................................ 32, 38

*JSC Transmashholding v. Miller*,
  70 F. Supp. 3d 516 (D.D.C. 2014) ............................................................................ 11

*Kerry v. Din*,
  135 S. Ct. 2128 (2015) ............................................................................ 31, 32, 33

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ............................................................................ 19, 32, 37

*Kowal v. MCI Commc'ns Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994) ............................................................................ 12, 18

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*,
  104 F.3d 1349 (D.C. Cir. 1997) ............................................................ 38, 39, 40

*Loughhalam v. Trump*,
  230 F. Supp. 3d 26 (D. Mass. 2017) ............................................................................ 33

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................ 13

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................................................ 23

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ............................................................................ 36

*Moms Against Mercury v. FDA*,
  483 F.3d 824 (D.C. Cir. 2007) ............................................................................ 10, 18

*Nat'l Venture Capital Ass'n v. Duke*,
  291 F. Supp. 3d 5 (D.D.C. 2017) ............................................................................ 16, 17

*Nguyen v. U.S. Dep't of Homeland Sec.*,
  --- F. Supp. 3d. ---, 2020 WL 2527210 (D.D.C. May 18, 2020) ............................... *passim*

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ............................................................................ 11, 13

*Pub. Citizen v. U.S. Trade Representative*,
    5 F.3d 549 (D.C. Cir. 1993) ................................................................................... 18

*Rafeedie v. I.N.S.*,
    880 F.2d 506 (D.C. Cir. 1989) ................................................................................. 32

*Ramirez v. U.S. Immigration and Customs Enforcement*,
    338 F. Supp. 3d 1 (D.D.C. 2018) ............................................................................ 17

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003) ................................................................................. 24

*Rohrbaugh v. Pompeo*,
    394 F. Supp. 3d 128 (D.D.C. 2019), *aff'd sub nom. Justin Ashley Rohrbaugh, Husband & Olga Leticia Garcia Marroquin De Rohrbaugh, Wife, Appellants v. Michael R. Pompeo, Sec'y of State, U.S. Dep't of State, in his official capacity as well as his successors & assigns, et al., Appellees*, No. 19-5263, 2020 WL 2610600 (D.C. Cir. May 15, 2020) ................................... 33

*S. Bay United Pentecostal Church v. Newsom*,
    No. 19A1044, 2020 WL 2813056 (U.S. May 29, 2020) ............................................ 3

*Saavedra Bruno v. Albright*,
    197 F.3d 1153 (D.C. Cir. 1999) ....................................................................... 19, 20

*Sale v. Haitian Centers Council, Inc.*,
    509 U.S. 155 (1993) ....................................................................................... 27, 28

*Scolaro v. D.C. Bd. of Elections & Ethics*,
    104 F. Supp. 2d 18 (D.D.C. 2000) .......................................................................... 11

*Singh v. Tillerson*,
    271 F. Supp. 3d 64 (D.D.C. 2017) ............................................................... 34, 35, 36

*Smirnov v. Clinton*,
    806 F. Supp. 2d 1 (D.D.C. 2011), *aff'd.*, 487 F. App'x 582 (D.C. Cir. 2012) ......................... 32

*Swartz v. Rogers*,
    254 F.2d 338 (D.C. Cir. 1958), *cert. denied*, 357 U.S. 982 (1958)...................................... 3, 33

*Thomas v. Principi*,
    394 F.3d 970 (D.C. Cir. 2005) ................................................................................. 11

*Tingzi Wang v. United States Citizenship & Immigration Servs.*,
 375 F. Supp. 3d 22 (D.D.C. 2019) ........................................................ 32

*Tongatapu Woodcraft v. Feldman*,
 736 F.2d 1305 (9th Cir. 1984).............................................................. 33

*Town of Castle Rock, Colo. v. Gonzales*,
 545 U.S. 748 (2005) ......................................................... 30, 31, 36

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
 137 S. Ct. 1645 (2017) ........................................................... 13

*Trump v. Hawaii*,
 138 S. Ct. 2392 (2018) ......................................................... *passim*

*Tulare Cty. v. Bush*,
 185 F. Supp. 2d 18 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002). ........ 21, 22

*U.S. Dep't of State*,
 658 F. Supp. 2d 105 (D.D.C. 2009) ........................................... 21

*U.S. ex rel. Knauff v. Shaughnessy*,
 338 U.S. 537 (1950) ...................................................... 22, 25, 29

*Udugampola v. Jacobs*,
 795 F. Supp. 2d 96 (D.D.C. 2011) ........................................ 19, 34

*United States v. Verdugo-Urquidez*,
 494 U.S. 259 (1990) ........................................................ 3, 32, 38

*Van Ravenswaay v. Napolitano*,
 613 F. Supp. 2d 1 (D.D.C. 2009) ........................................... 20

*Warth v. Seldin*,
 422 U.S. 490 (1975) ........................................................... 13

*Weinberger v. Wiesenfeld*,
 420 U.S. 636 (1975) ........................................................... 38

*Williamson v. Lee Optical of Oklahoma Inc.*,
 348 U.S. 483 (1955) ....................................................... 40, 41

*XP Vehicles, Inc. v. Dep't of Energy,*
  118 F. Supp. 3d 38 (D.D.C. 2015) ........................................................... 40

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ............................................................................... 26

## ADMINISTRATIVE DECSION

*Matter of Ho,*
  19 I. & N. Dec. 582 (BIA 1988) ............................................................. 33

## STATUTES

5 U.S.C. § 551(13) ...................................................................................... 23, 24

5 U.S.C. § 701(a)(1) ................................................................................... 19

5 U.S.C. § 702 ............................................................................................ 23

5 U.S.C. § 702(1) ....................................................................................... 20

5 U.S.C. § 704 ............................................................................................ 24

8 U.S.C. § 1104(a) ..................................................................................... 19

8 U.S.C. § 1151(a)(1) ................................................................................. 15

8 U.S.C. § 1151(a)(4) ................................................................................. 15

8 U.S.C. § 1182(f) ................................................................................ 2, 6, 22, 25

8 U.S.C. § 1185(a) ............................................................................... 2, 6, 22

8 U.S.C. § 1187(f) ..................................................................................... 36

8 U.S.C. § 1201(a) ..................................................................................... 19

8 U.S.C. § 1201(g) ............................................................................... *passim*

8 U.S.C. § 1252 .......................................................................................... 19

# FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b)(1)........................................................................... 1, 3, 10, 42

Fed. R. Civ. P. 12(b)(6)............................................................................ *passim*

# FEDERAL REGISTER

84 Fed. Reg. 53, 991 ................................................................................ 28

85 Fed. Reg. 15, 37-38 .............................................................................. 2

85 Fed. Reg. 23, 441 ................................................................................ *passim*

85 Fed. Reg. 23, 442 ............................................................................ 1, 6, 26

85 Fed. Reg. 23, 443 ............................................................................... 1, 6

85 Fed. Reg. 23, 444 ............................................................................... 1, 24

# EXCUTIVE PROCLAMATIONS

Presidential Proclamation 9945 ................................................................ 28

Presidential Proclamation 10014 .............................................................. 1, 4

# MISCELLANEOUS

U.S. Department of State–Bureau of Consular Affairs, *Proclamation Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak*, https://travel.state.gov/content/travel/en/News/visas-news/Proclamation-Suspending-Entry-of-Immigrants-Who-Present-Risk-to-the-US-labor-market.html (Last visited June 8, 2020).................................................................. 7

U.S. Department of State–Bureau of Consular Affairs*, Suspension of Routine Visa Services*, https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html (Last visited June 8, 2020) ................................................................. 4

## INTRODUCTION

Through their amended complaint, Plaintiffs seek to enjoin Presidential Proclamation 10014, Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak, 85 Fed. Reg. 23,441-44 (Apr. 22, 2020) (the "COVID-19 Labor Proclamation" or "Proclamation"). In this Proclamation, the President exercised his broad statutory authority to temporarily suspend or limit for a 60-day period the admission of certain aliens as immigrants to the United States, while the Nation addresses the harms to the labor market and the country that have been caused by the devastating COVID-19 pandemic. The Court can dismiss Plaintiffs' amended complaint in its entirety under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

The Court lacks subject matter jurisdiction under Rule 12(b)(1) because no Plaintiff has standing. Plaintiffs each allege injuries related to delays in the re-adjudication of visa applications or in the scheduling of visa-application interviews, none of which has a causal connection to the COVID-19 Labor Proclamation. This Court has already reached this conclusion. *See Nguyen v. U.S. Dep't of Homeland Sec.*, --- F. Supp. 3d ---, 2020 WL 2527210, at *6 (D.D.C. May 18, 2020) (recognizing that "the court cannot remedy an injury that is not caused by the challenged action before it"). Thus, the Court should reach the same conclusion and dismiss Plaintiffs' amended complaint in its entirety for lack of standing.

Even if Plaintiffs could establish standing, the Court can still dismiss the amended complaint in its entirety under Rule 12(b)(6) because all of Plaintiffs' claims fail as a matter of law. First, Plaintiffs' claims under the Administrative Procedure Act (APA) (Counts I, V, and VI), and that the Proclamation is *ultra vires* (Count IV), fail to state a claim for relief because the APA does not provide Plaintiffs with a basis to seek judicial review of a Presidential Proclamation. *See*

*Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (holding that the President's actions "are not subject" to the requirements of APA). Plaintiffs' *ultra vires* claim fails for that same reason. Plaintiffs also fail to identify a final agency action that the Court can review, and even if they could, such review is precluded by the principles of consular non-reviewability. Further, even if Plaintiffs could somehow get past these fatal defects, they still cannot prevail because the President lawfully issued the Proclamation under his broad statutory authority to suspend the entry of certain aliens based on his finding that their entry would be detrimental to the interests of the United States. *See* 8 U.S.C. §§ 1182(f), 1185(a). On March 13, 2020, the President declared that the COVID-19 outbreak in the United States constituted a national emergency. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak, 85 Fed. Reg. 15,337-38 (Mar. 13, 2020). In the four weeks following that declaration, "more than 22 million Americans filed for unemployment." 85 Fed. Reg. at 23,441. The President determined that, "without intervention," the United States would face "a potentially protracted economic recovery with persistently high unemployment if labor supply outpaces labor demand," including from new immigrants. *Id*. The Proclamation is, under *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), a lawful response to the significant harm caused by this national emergency. Accordingly, Plaintiffs fail to state a claim for relief under the APA and that the Proclamation is *ultra vires*.

Second, Plaintiffs' constitutional claims under the Fifth Amendment (Counts II and III) fail for several reasons. Five of the plaintiffs (Maksymenko and her spouse Kovalov; Lykov, his spouse Lykova, and their child Lykova) are foreign nationals, not present in the United States, who are seeking to try to enter the country through the diversity visa program. *See* Am. Compl., ¶¶ 19, 20. These plaintiffs fail to assert any claim for relief as the Supreme Court has long held that the Fifth Amendment does not apply to foreign nationals outside of the United States. *See United*

*States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990). Thus, these plaintiffs' Fifth Amendment claims for equal protection (Count II) and procedural due process (Count III) should be dismissed as a matter of law. The Plaintiffs who are U.S. citizens or lawful permanent residents also fail to state a claim for equal protection (Count II) because the COVID-19 Labor Proclamation does not treat similarly situated persons differently. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). And to the extent any of the U.S. citizen or lawful permanent resident plaintiffs are asserting a procedural due process challenge (Count III), these claims similarly fail because these plaintiffs cannot identify any liberty or property interest that they were allegedly deprived of because of the COVID-19 Labor Proclamation. *See Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958) *cert. denied*, 357 U.S. 982 (1958). And, even if they could identify such as interest, the Court can still dismiss their procedural due process claim because they received all of the process that they arguably were entitled to receive. *See Hawaii*, 138 S. Ct. at 2418-20.

For these reasons, the Court can dismiss Plaintiffs' amended complaint in its entirety under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## FACTS AND RELEVANT BACKGROUND

### 1.   The COVID-19 Pandemic and the COVID-19 Labor Proclamation

The COVID-19 pandemic has presented serious and unique challenges for countries around the world. *See S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056 (U.S. May 29, 2020) (concurring opinion of Roberts, C.J.) (describing COVID–19 as "a novel severe acute respiratory illness that has killed . . . more than 100,000 nationwide" and noting that, at this time, "there is no known cure, no effective treatment, and no vaccine"). The United States government has taken a range of steps to respond to the pandemic and stem the spread of the virus. The State Department has, for example, sought to protect its employees and the public while

maintaining mission-critical services. On March 20, 2020, the State Department announced that it would "temporarily suspend routine visa services at all U.S. Embassies and Consulates," but noted that "emergency and mission critical visa services" would continue as resources allow. U.S. Department of State–Bureau of Consular Affairs, *Suspension of Routine Visa Services*, https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html (last visited May 6, 2020). That announcement remains in effect. *Id.*

About a month after that announcement, on April 22, the President signed the COVID-19 Labor Proclamation. *See* Presidential Proclamation 10014, Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak, 85 Fed. Reg. 23,441 (Apr. 27, 2020). The President issued the Proclamation in large part to address the rising unemployment rate caused by the virus and the policies that have been necessary to mitigate the spread of COVID-19 in the United States that have damaged the U.S. economy. *Id.* Unemployment claims have reached "historic levels"— between March 13, when the President declared a national emergency, and April 11, "more than 22 million Americans have filed for unemployment." *Id.*

As the President explained, administering our immigration system during the pandemic requires "be[ing] mindful of the impact of foreign workers on the United States labor market, particularly in an environment of high domestic unemployment and depressed demand for labor," as well as "conserv[ing] critical State Department resources so that consular officers may continue to provide services to United States citizens abroad." 85 Fed. Reg. 23,441. "[W]ithout intervention, the United States faces a potentially protracted economic recovery with persistently high unemployment if labor supply outpaces labor demand." *Id.* An excess labor supply "is particularly harmful to workers at the margin between employment and unemployment," as they are the ones

"likely to bear the burden of excess labor supply disproportionately." *Id*. Recently, "these workers have been disproportionately represented by historically disadvantaged groups, including African Americans and other minorities, those without a college degree, and the disabled." *Id*.

Once immigrants are admitted as lawful permanent residents, they are immediately eligible "to compete for almost any job," and the "vast majority of immigrant visa categories do not require employers to account for displacement of United States workers." 85 Fed. Reg. 23,441. For example, there is typically no way to direct "new residents to particular economic sectors with a demonstrated need not met by the existing labor supply" so that "already disadvantaged and unemployed Americans" would be protected "from the threat of competition for scarce jobs from new lawful permanent residents." *Id*. Although "some employment-based visas contain a labor certification requirement," that certification, issued long before the visa is granted, would not "capture the status of the labor market today." *Id.* at 23,442.

In addition to these labor impacts, the Proclamation addresses other harms caused by continuing immigration during this 60-day period. First, "introducing additional permanent residents when our healthcare resources are limited puts strain on the finite limits of our healthcare system at a time when we need to prioritize Americans and the existing immigrant population." *Id*. The Proclamation also recognizes burdens abroad on the State Department, explaining that "[e]ven with their ranks diminished by staffing disruptions caused by the pandemic, consular officers continue to provide assistance to United States citizens." *Id*. Thus, the Proclamation serves to "conserve critical State Department resources so that consular officers may continue to provide services to United States citizens abroad." *Id*.

To address these complex challenges, the President issued the COVID-19 Labor Proclamation under, *inter alia*, 8 U.S.C. § 1182(f) and § 1185(a), and suspended entry into the

United States, for 60 days, of intending immigrants abroad who did not already have a valid immigrant visa or travel document as of the date the Proclamation was signed, April 23, 2020. 85 Fed. Reg. 23,442, §§ 1, 2(a). The Proclamation also exempts individuals who are already in the United States, lawful permanent residents, and several categories of intending immigrants, including individuals who apply for visas to work as healthcare professionals, COVID-19 researchers, or other COVID-19 essential workers, and their spouses and children; any individual applying for an EB-5 immigrant investor visa; any spouse of a U.S. citizen; anyone under age 21 who is the child of a U.S. citizen or is coming to the United States to be adopted; members of the United States Armed Forces, and their spouses and children; and nationals of Afghanistan and Iraq who are applicants for "Special Immigrant Visas" in the SI or SQ classifications, and their spouses and children. 85 Fed. Reg. 23,442, § 2(b). The Proclamation also exempts any intending immigrant "whose entry would further important United States law enforcement objectives, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees, based on a recommendation of the Attorney General or his designee," or "whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees." *Id.* Thus, under the Proclamation, agencies retain some discretion to provide an exemption to individuals whose admission would otherwise not be permitted.

The Proclamation expires on June 22, 2020. 85 Fed. Reg. 23,443, §§ 4, 5. By June 12, 2020, the Secretary of Homeland Security, upon consultation with the Secretaries of State and Labor, will recommend to the President whether to continue or modify the Proclamation, and then the President will decide if such action is necessary. *Id.* The State Department posted notice online, which explains that, as with the earlier notice informing the public of the suspension of routine visa services at U.S. consular posts worldwide, "as resources allow, embassies and consulates will

continue to provide emergency and mission critical visa services for applicants who may be eligible for an exception under this presidential proclamation." U.S. Department of State–Bureau of Consular Affairs, *Proclamation Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak*, https://travel.state.gov/content/travel/en/News/visas-news/Proclamation-Suspending-Entry-of-Immigrants-Who-Present-Risk-to-the-US-labor-market.html (last visited May 6, 2020).

2. **Procedural Background**

*Plaintiffs' Original Complaint*.   On March 12, 2020, Plaintiff Jessica Nguyen, a U.S. citizen, filed this suit as a mandamus action seeking to compel agency action with respect to the visa-application by her brother and his family members, who she had petitioned for as an immigrant. Pls.' Orig. Compl., ECF No. 1 at 8, Prayer for Relief (seeking "writ of mandamus compelling Defendants to promptly complete all administrative processing within sixty days"). Ms. Nguyen had filed an I-130 immigrant petition for alien relative with the Department of Homeland Security (DHS) in 2005 on behalf of her brother and his derivative family members. *Id.* ¶ 17. DHS approved the petition, and after Ms. Nguyen's brother applied for a visa at the U.S. Consulate General in Ho Chi Minh City, Vietnam, a consular officer conducted a visa interview for Ms. Nguyen's relatives on October 21, 2019. *Id.* ¶ 20. Because additional documentation was needed from the applicants, the consular officer refused the applicants' visas under 8 U.S.C. § 1201(g). *See* Dybdahl Decl. ¶ 5, ECF No. 14-1.

*Plaintiffs' Amended Complaint*.   On April 27, after the Proclamation was issued, Plaintiffs filed an amended class-action complaint seeking declaratory and injunctive relief, dramatically expanding the scope of this lawsuit and adding the President of the United States as a defendant. *See* Am. Compl., ECF No. 5. The Amended Complaint asserts that the COVID-19 Labor

Proclamation is illegal and should be enjoined nationwide. *Id*. Plaintiffs assert that the Proclamation violates the Immigration and Nationality Act (INA) and should be set aside as contrary to the APA and the U.S. Constitution. *Id*. ¶¶ 133-172. The Amended Complaint also adds additional plaintiffs, alleging that the Proclamation harms each of these plaintiffs in his or her ability to unite with family members in the United States through the immigrant visa and diversity visa processes. *Id*. ¶ 120.  Plaintiffs do not allege any concrete facts that connects these alleged harms to the Proclamation.

For the additional plaintiffs added by the Amended Complaint, Plaintiffs allege as follows:

Driss Houti is a U.S. citizen who filed three I-130 petitions in 2014 on behalf of his three adult children who are citizens of Morocco. *Id*. ¶ 13. DHS approved the petitions and the beneficiaries applied for visas in September 2019 and January 2020. *Id*. The consular officer refused the applicants' visas under 8 U.S.C. § 1201(g). Dybdahl Decl. ¶¶ 6, 7, 8. On March 6, 2020, the consular post responded to the applicants' inquiries and provided them with information on how to ask for the I-130 petition classification change with DHS. *Id*.

Jaafa Al-Dahwi is a U.S. citizen who filed an I-130 petition in 2016 on behalf of his father, a citizen of Iraq. Am. Compl., ECF No. 5 ¶ 14. DHS approved the petition and the beneficiary applied for a visa in October 2017. *Id*. The consular officer refused the applicant's visa application under 8 U.S.C. § 1201(g). Dybdahl Decl. ¶ 9.

Md Zahiduz Zaman is a U.S. citizen who filed an I-130 petition in 2016 on behalf of his parents, citizens of Bangladesh. Am. Compl., ECF No. 5 ¶ 15. DHS approved the petition and the beneficiaries applied for visas in April 2018. *Id*. The consular officer refused the applicants' visas under 8 U.S.C. § 1201(g). Dybdahl Decl. ¶¶ 10, 11. After receiving additional information from the applicants in support their visa applications, the consular post contacted the applicants and

8

requested that they appear for another interview on April 15, 2020. *Id.* Due to the COVID-19 pandemic and resulting closure of U.S. consular posts in March 2020, the State Department canceled the interview and notified the applicants. *Id.*

Alberto Petrache is a U.S. citizen who filed an I-130 petition in 2018 on behalf of his mother, a citizen of Romania. Am. Compl., ECF No. 5 ¶ 16. DHS approved the petition and the State Department scheduled an interview for the beneficiary to apply for a visa for March 24, 2020. *Id.* Due to the COVID-19 pandemic and resulting closure of U.S. consular posts in March 2020, the State Department canceled the interview and notified the applicant. *Id.*; Dybdahl Decl. ¶ 12.

Abdulazeez Abdulazeez is a U.S. permanent resident who filed an I-130 petition on behalf of his spouse, a citizen of Iraq. Am. Compl., ECF No. 5 ¶ 17. DHS approved the petition and the beneficiary awaits scheduling of a visa application interview by the State Department. *Id.*; Dybdahl Decl. ¶ 13.

Chedi Juez Morales is U.S. permanent resident who filed an I-130 petition on behalf of his spouse, a citizen of Ecuador. Am. Compl., ECF No. 5 ¶ 18. DHS approved the petition and the beneficiary awaits scheduling of a visa application interview by the State Department. *Id.*; Dybdahl Decl. ¶ 14.

Yulia Maksymenko and her spouse Yevhen Kovalov, are Ukrainian citizens who are a diversity-visa selectee and a derivative of a diversity-visa selectee, respectively. Am. Compl., ECF No. 5 ¶ 19. She is waiting for the State Department to schedule a visa application interview. *Id.*; Dybdahl Decl. ¶ 15.

Andrei Lykov, his spouse, Evgeniia Lykova, and their child, Milana Lykova, are Russian citizens who are a diversity-visa selectee and derivatives of a diversity-visa selectee, respectively.

Am. Compl., ECF No. 5 ¶ 20. He is waiting for the State Department to schedule a visa application interview. *Id.*; Dybdahl Decl. ¶ 16.

*Plaintiffs' Motion for a Temporary Restraining Order*. The day that Plaintiffs filed the Amended Complaint, they also filed a motion for a temporary restraining order ("TRO") seeking to enjoin COVID-19 Labor Proclamation and the implementation of this Proclamation. *See* Pls' TRO Mot., ECF No. 6. The Government filed a brief in opposition arguing, among other things, that Plaintiffs lacked standing to challenge the COVID-19 Labor Proclamation. Def's Opp. to Pls' TRO Mot., ECF No. 14.

On May 18, 2020, the Court denied Plaintiffs' TRO motion. *See Nguyen*, 2020 WL 2527210, at *1. The Court found that Plaintiffs had failed to establish Article III standing. *Id.* Specifically, the Court found that Plaintiffs had failed to demonstrate either causation or redressability. *Id.* at *4-*6. The Court, however, declined to dismiss this action at that time. *Id.* at *7. The Government now moves to dismiss Plaintiffs' amended complaint in its entirety for the reasons set forth below.

## STANDARD OF REVIEW

*Federal Rule of Civil Procedure 12(b)(1)*. The plaintiffs bear the burden of establishing that the court has subject matter jurisdiction over their claims. *Moms Against Mercury v. FDA,* 483 F.3d 824, 828 (D.C. Cir. 2007). It is well established that a lack of standing pursuant to Article III of the United States Constitution deprives a court of subject matter jurisdiction. *People for Ethical Treatment of Animals, Inc. (PETA) v. Perdue*, No. CV 18-1137-TFH, 2020 WL 2800995, at *3 (D.D.C. May 29, 2020) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541-42 (1986); *O'Shea v. Littleton*, 414 U.S. 488, 493-95 (1974)). To survive a Rule 12(b)(1) motion to dismiss for lack of standing, "a complaint must state a plausible claim that the plaintiff has suffered

an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015).

In deciding a motion to dismiss based upon lack of subject matter jurisdiction, the Court "need not limit itself to the allegations of the complaint." *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 14 (D.D.C. 2001). Rather, the "[C]ourt may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000). Additionally, the Court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged[.]'" *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). However, "the [p]laintiff's factual allegations in the complaint ... will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge*, 185 F. Supp. 2d at 13–14.

*Federal Rule of Civil Procedure 12(b)(6)*.  A motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6) motion tests whether the complaint "state[s] a claim upon which relief can be granted." *JSC Transmashholding v. Miller*, 70 F. Supp. 3d 516, 520 (D.D.C. 2014) (citing Fed. R. Civ. P. 12(b)(6)). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citations omitted). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Twombly*, 550 U.S. at 570). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*., citing *Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*., quoting *Twombly*, 550 U.S. at 556.

A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555).

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

## ARGUMENT

### 1.  Plaintiffs do not have standing to proceed.

Plaintiffs' request for relief fails at the threshold because none of them has standing to proceed. *See, e.g., Humane Soc'y*, 797 F.3d at 8. No plaintiff has identified a concrete and particularized injury that is fairly traceable to the COVID-19 Labor Proclamation and that the Court could lawfully redress. *See Nguyen*, 2020 WL 2527210, *9-*13. The Court can dismiss Plaintiffs' amended complaint in its entirety on this ground alone.  *See, e.g., O'Shea*, 414 U.S. at 493-95; *PETA*, 2020 WL 2800995, at *3.

Standing concerns whether a plaintiff "has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (citations and quotations omitted). Built on separation-of-powers principles, standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To satisfy the "'irreducible constitutional minimum' of standing" under Article III of the Constitution, a plaintiff must demonstrate that they have: "(1) an 'injury in fact' that is 'concrete and particularized' as well as 'actual or imminent'; (2) a 'causal connection' between the injury and the challenged conduct; and (3) a likelihood, as opposed to mere speculation, 'that the injury will be redressed by a favorable decision.'" *Ark Initiative v. Tidwell*, 749 F.3d 1071, 1075 (D.C. Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also Nguyen*, 2020 WL 2527210, *7, *9 (discussing the requirements for standing). The party invoking federal jurisdiction bears the burden of establishing these elements. *See Lujan*, 504 U.S. at 561; *see also Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("For all relief sought, there must be a litigant with standing" as "standing is not dispensed in gross").

Here, Plaintiffs allege injuries related to delays in the re-adjudication of visa applications or in the scheduling of visa application interviews, none of which are traceable to the issuance of the COVID-19 Labor Proclamation. *See Nguyen*, 2020 WL 2527210, at *11. Plaintiffs allege that the Proclamation prevents their family members from completing the immigrant visa process, obtaining permanent resident status, and reuniting with their U.S. citizen relatives. But such allegations of injury are speculative, and they have not established a causal connection between them and the COVID-19 Labor Proclamation. Plaintiffs' applications are either already refused or

13

have not yet been executed, so they can only speculate—and without basis—that the temporary COVID-19 Labor Proclamation affects their claims. Indeed, no Plaintiff alleges that a consular officer has denied the visa applications at issue based on the Proclamation, and the delays in re-adjudicating refused visa applications predate the Proclamation because they are attributable to other factors, such as the need for the Plaintiff visa applicants to obtain additional materials in support of their visa applications and the mandatory closure of U.S. consular posts around the world due to the COVID-19 pandemic.

The lead Plaintiff, Ms. Nguyen, alleges that after filing an immigrant visa petition nearly 15 years ago, her sibling and his derivative family members appeared for an interview on October 21, 2019, at the U.S. Consulate General in Ho Chi Minh City, Vietnam. Am. Compl., ECF No. 5. ¶ 12. However, the consular officer refused issuance of immigrant visas under 8 U.S.C. § 1201(g) at the conclusion of the interview. Dybdahl Decl., ECF No. 14-1 at ¶ 5. On April 23, 2020, the consular section asked the applicants to address the deficiencies by requesting additional documentation from Ms. Nguyen's relatives to support their applications. *Id*. The Amended Complaint does not allege that Ms. Nguyen's sibling has complied with the consular section's request. Because Ms. Nguyen's relatives need to address the outstanding documentation request by the consular post before a consular officer can take any further action, Ms. Nguyen's allegation that the Proclamation will prevent her family members from coming to the United States, reuniting with her, and being unable to obtain permanent resident status, is wholly speculative. This speculation does not establish an injury in fact for purposes of standing. *See Clapper*, 568 U.S. at 411. There is also no causal connection between the timing of the processing of Ms. Nguyen's family members' visa applications and the COVID-19 Labor Proclamation. *Ark Initiative*, 749 F.3d at 1075. Ms. Nguyen's assertion that she "has been waiting for over 15 years" to reunite with

her brother is due to the annual limit on immigrant visa numbers that are allocated to the siblings of U.S. citizens as established by Congress, *see* 8 U.S.C. §§ 1151(a)(1), 1153(a)(4), not the COVID-19 Labor Proclamation.

Six other Plaintiffs (Houti, Al-Dahwi, Zaman, Petrache, Abdulazeez and Morales) make similarly speculative allegations of injury that are likewise not traceable to the COVID-19 Labor Proclamation. *See, e.g.*, Am. Compl. ¶¶ 13-18 (indicating that similar to the lead plaintiff, these plaintiffs are either U.S. citizens or lawful permanent residents, have each filed an immigrant petition on behalf of family members several years ago, and the family members have attended visa interviews at U.S. consular posts before the Proclamation or are waiting for consular posts to schedule interviews). As the above discussion of the lead Plaintiff illustrates, even if they are either U.S. citizens or lawful permanent residents who filed immigrant petitions on behalf of family members several years ago, that does not mean that the visa applications are anywhere close to being affected by the COVID-19 Labor Proclamation. Instead, Plaintiffs' family members have attended visa interviews and executed visa applications at U.S. consular posts, but those applications were refused under 8 U.S.C. § 1201(g) for reasons entirely unrelated to the COVID-19 Labor Proclamation, and the consular sections is waiting for those applicants to comply with requests for updated information in order to reconsider the refusals. Dybdahl Decl. ¶¶ 6-14. Even if this additional needed documentation were provided immediately to the respective consular sections, it is unlikely that the applicants would have their applications processed, receive notices of additional interviews (if necessary), or be found eligible and issued visas, given the very limited nature of consular operations across the world at this time—again, unrelated to the COVID-19 Labor Proclamation. *See Nguyen*, 2020 WL 2527210, at *12 ("There is another reason to doubt whether Plaintiffs' harms would be redressed by a favorable decision: The State Department has

15

suspended routine visa services worldwide since March 20, 2020, due to the COVID-19 pandemic"). Thus, the core of the Plaintiffs' allegations—that it is *the Proclamation* (as opposed to some combination of other facts) that is the sole barrier standing in their way of their family members coming to the United States, reuniting with them, and obtaining permanent resident status—is entirely speculative.

The five final Plaintiffs (Maksymenko and her spouse Kovalov; Lykov, his spouse Lykova, and their child Lykova), who were selected to possibly apply for visas as part of the 2020 diversity visa lottery, likewise fail to establish standing. *See* Am. Compl., ECF No. 5 ¶¶ 19, 20; Dybdahl Decl. ¶¶ 15, 16; *see also* Am. Compl., ECF No. 5 at ¶ 38 (explaining that the diversity visa "lottery" does not award immigrant visas "but the ability to apply for such a visa"). These Plaintiffs do not even allege that the COVID-19 Labor Proclamation injures them in any way. *Id*. Rather, they assert that they are "simply waiting for their visa interview[s] to be scheduled" and that "[i]f they do not receive their visas by September 30, 2020, they will lose their ability to obtain lawful permanent resident status in the United States." *Id*. Plaintiffs draw no connection between these claims and the COVID-19 Labor Proclamation, nor 'causal connection' between the injury and the challenged conduct; and a likelihood, as opposed to mere speculation, 'that the injury will be redressed by a favorable decision.'" *Ark Initiative*, 749 F.3d at 1075; *see also*, *Nguyen*, 2020 WL 2527210, at *9 (ruling that Plaintiffs "have not demonstrated a substantial likelihood of causation and redressability").

In prior briefing before this Court regarding Plaintiffs' TRO Motion, Plaintiffs argued that they could establish standing under *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5 (D.D.C. 2017) and *Ramirez v. U.S. Immigration and Customs Enforcement*, 338 F. Supp. 3d 1 (D.D.C. 2018). *See* Pls' Reply Br., ECF No. 19 at 7-10. Plaintiffs are incorrect. Neither of these two cases

involve a contention that the plaintiffs had standing based on an interest in family unification – the central interest assert by Plaintiffs in their Amended Complaint. ECF No. 5 ¶¶ 12-18. Rather both cases involved claims of standing based on possible "lost opportunity."

For example, *Nat'l Venture* involved a challenge to an agency rule that, in the view of the district court, effectively eliminated the plaintiffs' ability to participate in the International Entrepreneur Parole program that an agency had created by regulation. *Nat'l Venture*, 291 F. Supp. 3d at 9-11. Although the challenged rule technically only delayed implementation of the program, the district court found that because the agency was simultaneously seeking to eliminate the program, as a practical matter, the program "would never take effect" without judicial intervention. *See id*. at 11. Under these circumstances, the district court found that the agency had "effectively erased–rather than delayed" implementation of the regulation creating the International Entrepreneur Rule program and, that, thus, plaintiffs could establish standing to challenge the agency's rule. *Id*. at 14-15. The district court's analysis of the question of standing illustrates why the present case is so different – here Plaintiffs are challenging a Proclamation that temporarily suspends admission into the country for certain categories of immigrants.

*Ramirez* has an even more attenuated connection to the present case. Mr. Ramirez filed suit from immigration custody challenging the conditions of his confinement under applicable regulations. *See Ramirez*, 338 F. Supp. 3d at 22-31. Because he was in custody, the district court had "little difficulty concluding that Plaintiffs' injuries are not abstract, but direct and palpable." *Id*. at 27. Nor was redressability an issue given that an earlier court order in the same litigation had already resulted in Mr. Ramirez's release from custody. *See id*. at 26 n. 4. Moreover, although the district court in *Ramirez* discussed standing based on a theory of "lost opportunity," it noted that Mr. Ramirez properly alleged an independent basis for establishing standing meaning that the

district court's analysis regarding "lost opportunity" was not dispositive. *Id*. at 25 n.3. Thus, these two cases are readily distinguishable from the present case and neither decision addresses the concerns about traceability and redressability that this Court previously identified. *See Nguyen*, 2020 WL 2527210, at *11-*13.

In sum, as this Court has already noted, no Plaintiff has standing to proceed. *See id*. at *12-*13. As a result, this Court lacks jurisdiction and Plaintiffs' Amended Complaint should be dismissed. *See Moms*, 483 F.3d at 828; *PETA*, 2020 WL 2800995, at *3.

### 2.  Plaintiffs failed to state a claim under the APA (Counts I, V, and VI).

Even if Plaintiffs could somehow establish standing to proceed, the Court can also dismiss Plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. *See Browning*, 292 F.3d at 242; *Kowal*, 16 F.3d at 1276.

Plaintiffs' Amended Complaint purportedly contains three different APA claims: Violations of the APA (Count I), Procedural Violation of the APA (Count V), and Substantive Violation of the APA (Count VI). But all three of these counts raise overlapping claims and there is no need to address these counts separately.  All three of these counts fail for the reasons set forth below.

***No APA Review of Presidential Action.*** The Court cannot review Presidential actions, such as the COVID-19 Labor Proclamation, under the APA. *Franklin*, 505 U.S. at 801; *see also Dalton v. Specter*, 511 U.S. 462, 468 (1994) ("The APA does not apply to the President"); *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 553 (D.C. Cir. 1993) ("The President's actions are not 'agency action' and thus cannot be reviewed under the APA"). For this threshold reason, Plaintiffs' APA challenge to the COVID-19 Labor Proclamation fails as a matter of law. *See Browning*, 292 F.3d at 242.

18

*Consular Nonreviewability.* Plaintiffs' challenge to the President's executive action is also precluded by principles of consular nonreviewability. *See Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999). Far from authorizing Plaintiffs' challenge, the INA carefully cabins review to certain claims, and does not provide for court review of a consular officer's decisions or policies that govern those decisions. *See* 8 U.S.C. § 1252.

The doctrine of consular nonreviewability recognizes that Congress has empowered consular officers with the authority to issue or refuse an application for a visa made overseas. *See* 8 U.S.C. §§ 1104(a), 1201(a), (g). "[T]his Circuit has been very clear that the doctrine of consular nonreviewability is the rule not the exception." *Udugampola v. Jacobs*, 795 F. Supp. 2d 96, 103 (D.D.C. 2011). This rule is rooted in "ancient principle of international law that the 'power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government'" *Id*. (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972))). "[W]here Congress entrusts discretionary visa-processing ... in a consular officer ... the courts cannot substitute their judgments for those of the Executive." *Allen v. Milas*, 896 F.3d 1094, 1105 (9th Cir. 2018) (citing *Mandel*, 408 U.S. at 769–70).

Plaintiffs cannot state a claim under the INA or the APA to challenge consular officers' visa determinations. First, the APA does not apply "to the extent that ... statutes preclude judicial review," 5 U.S.C. § 701(a)(1), which is "determined not only from [the statute's] express language, but also from the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). It is well established in the D.C. Circuit that the text, structure, and history of the INA all compel the "unmistakable" conclusion that "the immigration laws 'preclude judicial review' of the consular

19

visa decisions." *Saavedra Bruno*, 197 F.3d at 1160. Indeed, Congress has specifically foreclosed APA review even for aliens subject to exclusion orders present in the United States, *see Allen*, 896 F.3d at 1157–62, because allowing such suits would "give recognition to a fallacious doctrine that an alien has a 'right' to enter this country which he may litigate in the courts of the United States against the U.S. government as a defendant." H.R. Rep. No. 1086, 87th Cong., 1st Sess. 33 (1966). Thus, visa denials are "not subject to judicial review ... unless Congress says otherwise." *Saavedra Bruno*, 197 F.3d at 1159. Second, the APA leaves intact other "limitations on judicial review," 5 U.S.C. § 702(1), including the "doctrine of consular nonreviewability," which predates the passage of the APA. *Saavedra Bruno*, 197 F.3d at 1160.

   Because Plaintiffs can point to no statutory provision that overrides the doctrine of consular nonreviewability in this setting, it does not matter how Plaintiffs style their claim: "An APA challenge based on a consular official's visa denial falls well within the scope of the consular nonreviewability doctrine, as interpreted by the D.C. Circuit." *Baan Rao Thai Rest. v. Pompeo*, No. 19-cv-58, 2019 WL 3413415, at *2 (D.D.C. July 29, 2019) (citing *Saavedra Bruno,* 197 F.3d at 1162, and *Van Ravenswaay v. Napolitano*, 613 F. Supp. 2d 1, 6 (D.D.C. 2009) (holding that the APA "provides no basis for challenging consular visa decisions")). Plaintiffs' APA challenge is an impermissible attempt to end-run around this doctrine and courts that have recently considered similar challenges have rejected them. *See, e.g.*, *Allen*, 896 F.3d 1094, 1107 (9th Cir. 2018) ("We agree with the D.C. Circuit's analysis and conclusion in *Saavedra Bruno*" that plaintiffs may not challenge the denial of a visa under the APA).

   The Amended Complaint does name several federal agencies alleging that they are involved in implementing the COVID-19 Labor Proclamation. *See* ECF No. 5. But that makes no legal difference. Actions taken by an executive branch agency to implement a Presidential

Proclamation, pursuant to discretionary authority that was committed to the President, are unreviewable under the APA—*all* presidential orders are necessarily implemented through Executive branch agencies. *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016), *aff'd,* 875 F.3d 1132 (D.C. Cir. 2017) (collecting cases, and reasoning that when the President retains final authority pursuant to the Constitution or a valid statute, "presidential acquiescence constitutes an exercise of discretion that gives effect to the delegee's actions" and thus, the action is unreviewable under the APA), *opinion amended and superseded,* 883 F.3d 895 (D.C. Cir. 2018), *as amended on denial of reh'g* (Mar. 6, 2018); *see also Jensen v. Nat'l Marine Fisheries Serv. (NOAA)*, 512 F.2d 1189, 1191 (9th Cir. 1975) ("For the purposes of this appeal the Secretary's actions are those of the President, and therefore by the terms of the APA the approval of the regulation at issue here is not reviewable"); *Tulare Cty. v. Bush*, 185 F. Supp. 2d 18, 28–29 (D.D.C. 2001) (finding that the agency was "merely carrying out directives of the President, and the APA does not apply to presidential action"), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002). It would be "absurd" to suggest that the President himself must personally carry out an action in order for the APA's limitation on judicial review to apply. *See Tulare Cty.*, 185 F. Supp. 2d at 28–29; *cf. Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 111 (D.D.C. 2009) ("To expose permitting decisions ... to judicial review under the APA just because the President assigned this power to a subordinate agency would run afoul of the separation of powers concerns that underlie the Supreme Court's decisions").

By way of illustration, in *Detroit Int'l Bridge*, a district court concluded that Congress had delegated authority to approve international bridges to the President, rather that the State Department, and that, therefore, these approvals were not subject to APA review notwithstanding the State Department's role in implementing the Presidential decision. *See Detroit Int'l Bridge*,

189 F. Supp. 3d at 104. As the district court noted, had Congress intended to ensure the reviewability of permit approvals, it could have delegated the authority directly to the Department of State and not to the President. *Id*. But because the statutory delegation of authority was to the President, judicial review under the APA was not permitted. *See id*. Similarly, here, Congress has expressly authorized the President, not the State Department, to suspend immigration into the United States. *See* 8 U.S.C. § 1182(f) ("Whenever the President finds that the entry of ... any class of aliens into the United States would be detrimental to the interests of the United States, he may ... suspend entry of ... any class of aliens ... or impose on the entry of aliens any restrictions he may deem to be appropriate"); *see also id*. § 1185(a)(1) ("[I]t shall be unlawful ... for any alien to ... enter ... the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."). These statutes both account for the President's inherent authority under Article II to control the border. *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (President's authority to exclude aliens in predecessor to section 1182(f) "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation"). Thus, when the President exercises his discretionary authority under these statutes, this exercise of discretion is not subject to APA review even if the President relies on agencies, such as the State Department, to carry-out his decision. *See Detroit Int'l Bridge,* 189 F. Supp. 3d at 104; *Tulare Cty.*, 185 F. Supp. 2d at 28–29. For this reason, Plaintiffs cannot state a claim under the APA against either the President or any agency with respect to the COVID-19 Labor Proclamation. *See Iqbal*, 556 U.S. at 678.

     ***No Final Agency Action.*** Plaintiffs' claims against the State Department suffer from an additional fatal defect: Plaintiffs have failed to identify any agency action, let alone any final agency action, by the Department of State or a consular officer of the Department of State, that

they wish to challenge. *See* Am. Compl., ECF No. 5 ¶¶ 60-61. The APA provides a cause of action to "[a] person suffering legal wrong because of *agency action*, or adversely affected or aggrieved by *agency action.*" 5 U.S.C. § 702 (emphases added). An "agency action" is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." *Id.* § 551(13). Review under the APA is further limited to "*final agency action* for which there is no other adequate remedy in a court." *Id.* § 704 (emphasis added). Plaintiffs falter under these statutory provisions.

To start, Plaintiffs identify no agency action. The D.C. Circuit has "long recognized that the term agency action is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19–20 (D.C. Cir. 2006) (a budget request did not constitute "agency action" within the meaning of 5 U.S.C. § 702) (quotations and citations omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990) (a challenge to the so-called "land withdrawal review program" is not "agency action" within the meaning of § 702, much less a "final agency action" within the meaning of § 704). The D.C. Circuit has concluded, for example, that an agency letter did not constitute agency action because "it was purely informational in nature; it imposed no obligations and denied no relief." *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also Ass'n of Admin. Law Judges v. U.S. Office of Pers. Mgmt.*, 640 F. Supp. 2d 66, 73 (D.D.C. 2009) (holding that a notice that an agency intended to post was not subject to judicial review under the APA because, among other things, the notice was not a rule, order, sanction, or relief under 5 U.S.C. § 551(13)).

Here, the State Department's decision to provide notice on its website of the COVID-19 Labor Proclamation and advise of exceptions contained in the Proclamation does not constitute

agency action, because it is "purely informative in nature." *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427. By its terms, the Proclamation would have gone into effect even if the Department of State had never provided any notice of it. *See* 85 Fed. Reg. 23,444. In the absence of any agency action identified by Plaintiffs, judicial review under the APA is not available.

Even if the State Department's notice were agency action, it would still not constitute "final agency action" within the meaning of 5 U.S.C. § 704 and, thus, it would still not be subject to judicial review. To constitute "final agency action," an action both must "mark the consummation of the agency's decisionmaking process" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and quotations omitted); *see also Franklin*, 505 U.S. at 796-97 ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties") (citations and quotations omitted). Thus, for example, an agency statement of its intention to "make a preliminary determination that the sprinkler heads present a substantial product hazard, and a request for voluntary corrective action" is not constitute final agency action under 5 U.S.C. § 704. *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003).

Here, the decision by the State Department to provide notice regarding the COVID-19 Labor Proclamation does not mark the consummation of an agency's decision-making process and there are no legal consequences that flow from this decision. *See Bennett*, 520 U.S. at 177–78. This notice, by itself, does not directly affect Plaintiffs. *See Franklin*, 505 U.S. at 796-97. As a result, it does not constitute final agency action that is subject to judicial review under the APA. *See Browning*, 292 F.3d at 242.

**The Proclamation is lawful.**  Beyond the threshold barriers to their suit set forth above, Plaintiffs also cannot prevail on the merits because the President lawfully issued the COVID-19 Labor Proclamation. The Supreme Court has long recognized that "[t]he exclusion of aliens is a fundamental act of sovereignty" that is grounded in the legislative power and also "inherent in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542; *see also Hawaii*, 138 S. Ct. at 2424 (Thomas, J., concurring) ("the President has *inherent* authority to exclude aliens from the country") (emphasis original). Moreover, "the decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General." *See Knauff*, 338 U.S. at 543.

Congress, in enacting 8 U.S.C. § 1182(f), recognized the President's authority to suspend entry of foreign nationals. Section 1182(f) provides that "[w]henever the President finds that the entry of ... any class of aliens into the United States would be detrimental to the interests of the United States, he may ... suspend entry of ... any class of aliens ... or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f); *see also id.* § 1185(a)(1) ("[I]t shall be unlawful ... for any alien to ... enter ... the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."). Where, as here, the President "acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possess in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). And, as the Supreme Court has recognized, § 1182(f) "exudes deference to the President in every clause" and "entrusts to the President the decisions whether and when to

suspend entry," "whose entry to suspend," "for how long," and "on what conditions." *Hawaii*, 138 S. Ct. at 2408.

The President lawfully exercised this authority after "determin[ing] that the entry, during the next 60 days, of certain aliens as immigrants would be detrimental to the interests of the United States." 85 Fed. Reg. 23,442; *see Hawaii*, 138 S. Ct. at 2408 (explaining that the "sole prerequisite" to this "comprehensive delegation" is that the President find that entry of the covered aliens would be detrimental to the interests of the United States). The Proclamation sets out the President's reasons for finding that entry of certain intending immigrants would be detrimental to the United States during the economic recovery following the COVID-19 pandemic, with the goal of increasing access to the labor market for American workers, particularly those who are "at the margin between employment and unemployment." 85 Fed. Reg. 23,441. The President also explained that immigrants, upon admission as lawful permanent residents, are immediately eligible "to compete for almost any job," and thus "already disadvantaged and unemployed Americans" are left unprotected "from the threat of competition for scare jobs from new lawful permanent residents." *Id*. And, the President added, allowing additional immigrants to enter during this time of economic recovery would further strain "the finite limits of our healthcare system at a time when we need to prioritize Americans and the existing immigrant population." *Id.* at 23,442. It would further strain State Department resources abroad during a period when many of those posts must remain closed. *Id.*

Plaintiffs previously argued that the Proclamation is invalid because it lacks adequate "factual findings" explaining why the admission of aliens would be detrimental to the interests of the United States. *See* TRO Mot. 24-26. However, the Supreme Court rejected a very similar argument in *Hawaii*, holding that the "sole prerequisite" to the "comprehensive delegation"

contained in section 1182(f) is that the President find that entry of the covered aliens would be detrimental to the interests of the United States. *Hawaii*, 138 S. Ct. at 2408; *see also id*. at 2409 (explaining that past Presidential proclamations had stated in as little as "one sentence why suspending entry of members of the Sudanese government and armed forces" was in the interests of the United States). As the Court explained, the statute does not permit litigants to "challenge" a Presidential entry-suspension order "based on their perception of its effectiveness and wisdom," because Congress did not permit courts to substitute their own assessments "for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy." *Id.* at 2421 (citations and quotations omitted); *see also id*. at 2409 (rejecting a "searching inquiry into the President's judgment"). Whether the President's chosen method of addressing a perceived risk to the interests of this country "is justified from a policy perspective" is irrelevant, because he need not "conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions." *Id*. at 2409 (citations omitted); *see also Sale v. Haitian Centers Council, Inc*., 509 U.S. 155, 165 (1993) ("[t]he wisdom of the policy choices" reflected in Presidential Proclamations are not "matter[s] for our consideration").

The Supreme Court's reasoning in *Hawaii* precludes Plaintiffs' challenge here. Plaintiffs may disagree with the President about the "effectiveness and wisdom" of the COVID-19 Labor Proclamation, because they contend that it would not be effective in addressing U.S. interests. But this is not a proper legal basis for challenging Presidential action under section 1182(f), as the Supreme Court made clear in *Hawaii*, 138 S. Ct. at 2409, 2421. Nothing in *Hawaii* limits that decision to the context of terrorism or national security. *See id.* at 2413 (recognizing that the statute "grants the President sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long"). In fact, in *Hawaii* the Court rejected the plaintiffs' reading of

§ 1182(f) in part because it would not permit the President to properly "suspend entry from particular foreign states in response to an epidemic confined to a single region." *Id.* at 2415. The Court thus expressly recognized that a health emergency might be an appropriate basis for suspending entry under § 1182(f). *See id.* Moreover, the Supreme Court and D.C. Circuit have both upheld Presidential authority under § 1182(f) in contexts unrelated to terrorism and threats to national security. *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 160-61 (1993) (addressing a challenge to a proclamation addressing the "continuing illegal migration by sea of a large numbers of undocumented aliens"); *Abourezk v. Reagan*, 785 F.2d 1043, 1049 (D.C. Cir. 1986) (recognizing that the President "may act pursuant to section 1182(f) to suspend or restrict 'the entry of any aliens or any class of aliens' whose presence here he finds 'would be detrimental to the best interests of the United States.'"), *aff'd by an equally divided Court,* 484 U.S. 1 (1987).

Plaintiffs previously argued, in support of their TRO Motion, that their claims were supported by *Doe v. Trump*, 418 F. Supp. 3d 573, 592 (D. Or. 2019). *See* TRO Mot. 48-49. This reliance is misplaced. In *Doe*, a district court ruled that the President's use of § 1182(f) in issuing Presidential Proclamation 9945, Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System in Order to Protect the Availability of Healthcare Benefits for Americans ("Healthcare Proclamation"), 84 Fed. Reg. 53,991, violated the non-delegation doctrine because the Healthcare Proclamation "engage[d] in domestic policymaking, without addressing any foreign relations or national security issue or emergency." *Doe*, 418 F. Supp. at 592.

The district court's ruling in *Doe* was wrong and directly contrary to *Knauff*, which expressly held that the non-delegation doctrine does not apply to the President's exercise of statutory authority to limit entry to the United States, because that is a constitutional foreign-affairs

function over which the President shares constitutional authority along with Congress. *See* 338 U.S. at 542-43. In any event, there is no dispute here that the COVID-19 Labor Proclamation was issued expressly in response to a national emergency triggered by a worldwide crisis. 85 Fed. Reg. 23,441. Even under the cramped reading of Section 1182(f) put forward by the district court in *Doe,* a national emergency is an appropriate circumstance for the President to exercise the power delegated to him in section 1182(f). *See Doe*, 418 F. Supp. 3d at 592. The Ninth Circuit has also declined to adopt the district court's non-delegation theory, despite having two opportunities to consider that reasoning. *Doe #1 v. Trump,* --- F.3d ---, 2020 WL 2110978, at *13 (9th Cir. May 4, 2020); *see id*. at *24 (Bress, J., dissenting) ("It therefore is apparent that the majority justifies the district court's injunction on quite different legal bases than the district court itself"); *see also Doe #1 v. Trump*, 944 F.3d 1222, 1222 (9th Cir. 2019) (denying stay, but declining to address the merits of the district court's decision). Moreover, the district court in *Doe* denied a motion for a TRO seeking to enjoin the very Proclamation at issue here. *See Doe #1 v. Trump*, No. 3:19-CV-1743-SI, 2020 WL 2061775, at *4 (D. Or. Apr. 29, 2020). Although this denial rested on procedural grounds, it reflects that the COVID-19 Labor Proclamation is distinguishable from the Healthcare Proclamation that was enjoined in *Doe*.

The present case involves a national emergency based on the devastating effects of the global pandemic on the domestic labor market. Under Supreme Court precedent, the COVID-19 Labor Proclamation is a lawful exercise of the President's authority under § 1182(f). As a result, any challenge to the Proclamation under the APA necessarily fails. *See Iqbal*, 556 U.S. at 678.

### 3.   Plaintiffs fail to state a claim that the COVID-19 Labor Proclamation is *ultra vires* (Count IV).

Plaintiffs also argue that the Proclamation is "illegal and is therefore *ultra vires*." Am. Compl., ECF No. 5 ¶ 158. This is not a cognizable cause of action. And, even if it was, this

contention is duplicative of Plaintiffs' claim in Count I (Violation of the APA) that the President exceeded his authority in issuing the Proclamation. *Id*. at ¶ 136. Thus, Plaintiffs' claim that the Proclamation is *ultra vires* fails for the reasons set forth above.

### 4. As a matter of law, Plaintiffs fail to state a claim for a procedural due process violation under the Fifth Amendment (Count III).

This lawsuit includes both Plaintiffs outside of the United States who want to apply for a diversity visa and, if found eligible and issued, apply for admission to the United States (Yuliia Maksymenko, Yevhen Kovalov, Andrei Kykov, Evgenia Lykova, and Milana Lykova (collectively "the Plaintiffs Outside the United States")) and U.S. citizens and lawful permanent residents inside the United States who are challenging the Proclamation on the grounds that it purportedly prevents family members or spouses from applying for visas and/or being found eligible for visas that they could use to apply for admission to the United States (Jessica Nguyen, Driss Houti, Jaafar Al-Dahwi, Md Zahiduz Zaman, Abdulazeez, Chief Juez Morales (collectively "the Plaintiffs Inside the United States")). Neither group of plaintiffs may properly assert a procedural due process claim because, as a matter of law, neither group can identify any liberty or property interest that they purportedly have been deprived of "without due process of law." *See* U.S. Const. amend. V. The procedural component of the Due Process Clause does not protect everything that might be described as a "benefit." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005). Rather to have a protected interest in a benefit, a person clearly must have more than an abstract need or desire and "more than a unilateral expectation" of it; the person must have a "legitimate claim of entitlement to it." *See id*. (citations and quotations omitted). Because none of the Plaintiffs can assert a legitimate claim of entitlement to admission into the country either for themselves or for a spouse or family member, they failed to state a cognizable procedural due process claim. Moreover, even if plaintiffs could identify a constitutionally protected interest,

their claim would still fail because they cannot identify any process that they were purportedly entitled to before the Proclamation was issued.

> a. **As a matter of law, Plaintiffs fail to identify any constitutionally liberty or property interest protected by the Due Process Clause of the Fifth Amendment.**

The Fifth Amendment to the United States Constitution provides that "No person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The first inquiry in every due process challenge is whether the plaintiff was deprived of a protected interest in "liberty" or "property." *Gen. Elec. Co. v. Jackson,* 610 F.3d 110, 117 (D.C. Cir. 2010). "Only after finding the deprivation of a protected interest do[es] [the Court] look to see if the government's procedures comport with due process . . ." *Id.* quoting *Amer. Mfrs. Mut. Ins. v. Sullivan,* 526 U.S. 40, 59 (1999)); *see also Kerry v. Din*, 135 S. Ct. 2128, 2132 (2015) (opinion of Scalia, J.) ("The first question that we must ask, then, is whether the denial of Berashk's visa application deprived Din of any of these interests"). To establish a liberty or property interest, Plaintiffs must demonstrate that the Constitution or a federal or state statute grants them a protected right. *Doe v. U.S. Dep't. of Justice,* 753 F.2d 1092, 1124 (D.C. Cir. 1985). Here, none of the Plaintiffs can do so. As a result, their due process claim should be dismissed as a matter of law.

None of the Plaintiffs Outside of the United States have a liberty or property interest in applying for a diversity visa, much less being found eligible for and issued a visa, because the Fifth Amendment does not apply to aliens outside the United States. *Verdugo-Urquidez*, 494 U.S. at 269; *Johnson v. Eisentrager*, 339 U.S. 763, 770, 784 (1950). Specifically, the Supreme Court held that unadmitted, nonresident foreign nationals seeking entry into the United States cannot assert constitutional rights. *See, e.g., Din*, 135 S. Ct. at 2131 (opinion of Scalia, J.); *Mandel*, 408 U.S. at 762; *Hazama v. Tillerson*, 851 F.3d 706, 708 (7th Cir. 2017) ("The Supreme Court has consistently

recognized that unadmitted, nonresident aliens have no free-standing constitutional right to enter the United States). The Court has long recognized that the admission and exclusion of foreign nationals is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell,* 430 U.S. 787, 792 (1977); *see Harisiades v. Shaughnessy,* 342 U.S. 580, 588-589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power.").

As a result, an applicant for initial entry "has no constitutionally cognizable liberty interest in being permitted to enter the United States." *Rafeedie v. I.N.S.*, 880 F.2d 506, 520 (D.C. Cir. 1989). Such an applicant does not have a liberty or property interest in a visa or even "a constitutionally-protected interest in the procedures by which such visas are obtained." *Tingzi Wang v. United States Citizenship & Immigration Servs.*, 375 F. Supp. 3d 22, 41 (D.D.C. 2019) citing *Smirnov v. Clinton*, 806 F. Supp. 2d 1, 12 (D.D.C. 2011), *aff'd.*, 487 F. App'x 582 (D.C. Cir. 2012). This case law disposes of the claims brought by the Plaintiffs Outside the United States. *See Rafeedie*, 880 F.2d at 520; *Wang*, 375 F. Supp. 3d 22, 41. These Plaintiffs lack any liberty or property interest protected by the Fifth Amendment with respect to a potential diversity visa application. The fact that the Plaintiffs Outside the United States may have an approved petition is irrelevant because an approved petition vests no rights in the beneficiary. *See Matter of Ho*, 19 I. & N. Dec. 582, 589 (BIA 1988) (surveying federal appellate case law). Rather an approved immigrant petition is merely a preliminary step that allows the beneficiary to begin visa application process. *See Tongatapu Woodcraft v. Feldman*, 736 F.2d 1305, 1308 (9th Cir. 1984). In sum, the Plaintiffs Outside the United States cannot state a claim challenging the Proclamation on procedural Due Process grounds or assert any challenge with respect to the procedures under which

they would apply for visas. *See, e.g., Loughhalam v. Trump*, 230 F. Supp. 3d 26, 35 (D. Mass. 2017) (explaining in the context of a challenge to Presidential proclamation "[t]here is no constitutionally protected interest in either obtaining or continuing to possess a visa").

Likewise, the Plaintiffs Inside the United States are also unable to bring a due process challenge to the Proclamation. This is because courts have rejected the claim that individuals in the United States have a due process right to have their noncitizen family members receive a visa to enter and reside in the United States. *See Din*, 135 S. Ct. at 2135 (opinion of Scalia, J.); *Gebhardt v. Nielsen*, 879 F.3d 980, 988 (9th Cir. 2018) ("As we have said before, the generic right to live with family is 'far removed' from the specific right to reside in the United States with non-citizen family members.") *cert. denied*, 139 S. Ct. 330 (2018); *Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1022 (N.D. Cal. 2019) (dismissing plaintiffs' due process challenge to Presidential proclamation based on an alleged right to the "integrity of the family unit"). The D.C. Circuit has long recognized that a U.S. citizen has no constitutional rights violated by the deportation of his or her spouse. *See Swartz*, 254 F.2d at 339; *see also Rohrbaugh v. Pompeo*, 394 F. Supp. 3d 128, 133 (D.D.C. 2019) (recognizing the "numerous courts in this district have ruled that a U.S. citizen has no constitutional right which is violated by the denial of a spouse's visa application"), *aff'd sub nom. Justin Ashley Rohrbaugh, Husband & Olga Leticia Garcia Marroquin De Rohrbaugh, Wife, Appellants v. Michael R. Pompeo, Sec'y of State, U.S. Dep't of State, in his official capacity as well as his successors & assigns, et al., Appellees*, No. 19-5263, 2020 WL 2610600 (D.C. Cir. May 15, 2020). "[W]hile the Constitution protects individual's right to marry and the marital relationship, these constitutional rights are not implicated when a spouse is removed or denied entry to the United States." *Singh v. Tillerson*, 271 F. Supp. 3d 64, 71 (D.D.C. 2017); *see also, Escobar v. I.N.S.*, 700 F. Supp. 609, 612 (D.D.C. 1988) (holding "it is well settled that a citizen

33

spouse has no constitutional right to have his or her alien spouse enter or remain in the United States.").

Here, none of the Plaintiffs Inside the United States have a protected constitutional interest that would enable the plaintiff to challenge the Proclamation. Plaintiff Houti is asserting a constitutional challenge with respect to petitions he filed on behalf of "his three adult children." Am. Compl., ECF No. 5 ¶ 13. But the D.C. Circuit has found that "a parent does not have a constitutionally protected liberty interest in the companionship of a child who is past minority and independent." *Butera v. District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001); *see, e.g.*, *Udugampola*, 795 F. Supp. 2d at 105 ("The applicant's daughter's interest in maintaining a relationship with her father in the United States is therefore not a recognized protected constitutional interest"); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 27–28 (D.D.C. 2010) (recognizing that there "are many reasons why courts have been reluctant to extend procedural due process protections to the relationship between a parent and his adult child"). Thus, Plaintiff Houti's due process claim fails as a matter of law. Similarly, Plaintiffs Al-Dahwi, Zaman, and Petrache are asserting challenges with respect to immigrant petitions they have filed for the benefit of their parent or parents. *See* Am. Compl., ECF No. 5 ¶¶ 14-16. Although this situation is different from *Butera*, the reasoning of this opinion still applies. *See Butera*, 235 F.3d at 656 (recognizing that the differences between a parent-child relationship in which the child is a minor as opposed to a relationship where both the parent and the child are adults "are sufficiently marked to warrant sharply different constitutional treatment") (quotations and citations omitted). Just as a parent lacks a constitutionally protected interest in the companionship of an adult child, so to, an adult child lacks a constitutionally protected interest in the companionship of a parent. *See id.* As a result, these claims fail as a matter of law as well. *See Iqbal*, 556 U.S. at 678.

Plaintiffs Abdulazeez and Morales seek to assert due process claims with respect to their respective spouses. *See* Am. Compl., ECF No. 5 ¶¶ 17, 18. However, a U.S. citizen has no protected constitutional interest in the admission of his or her spouse into the country.  *See, e.g., Singh*, 271 F. Supp. 3d at 71; *Escobar*, 700 F. Supp. at 612. Plaintiffs Abdulazeez and Morales, who are lawful permanent residents, *see* Am. Compl., ECF No. 5 ¶¶ 17, 18, have no basis for asserting any claim greater than that of a U.S. citizen. As a result, they are also unable to assert a protected constitutional interest in the admission of their respective spouses into the country. Similarly, Plaintiff Nguyen who is asserting a claim with respect to her brother and his family, *see* Am. Compl., ECF No. 5 ¶ 12, cannot properly assert a due process claim with respect to their admission into the country. *See Gebhardt*, 879 F.3d at 988.

In their Amended Complaint, Plaintiffs argue that they do have a proper basis for asserting a due process claim because Congress, through the INA, "created statutory rights related to the petitioning for and the issuance of visas and other immigration benefits." Am. Compl., ECF No. 5 ¶ 150. They further contend that the Proclamation deprived Plaintiffs of these rights "without *any* due process." *Id*. at ¶ 154 (emphasis original). But Plaintiffs fail to address the fact that, although the INA does create a procedure for individuals to petition on behalf of a foreign spouse or family member, it also recognizes the President's authority to "suspend the entry of all aliens or any class of aliens" and to "impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1187(f). Thus, Plaintiffs fail to demonstrate anything more than a "unilateral expectation" that their spouse or family member would be able to enter the country on an immigrant visa. *See Castle Rock*, 545 U.S. at 756.

In sum, none of the Plaintiffs can plead a liberty or property interest with respect to the admission of their spouse or family member.  As a result, their procedural due process claims fail as a matter of law. *See Singh*, 271 F. Supp. 3d at 71.

> **b.** **Alternatively, Plaintiffs fail to state a procedural due process claim, because they cannot identify any additional process that they were entitled to receive.**

To the extent any plaintiff has a right to assert any due process right with respect to a spouse or family member, the government provides all the process that is due by giving a statutory citation to explain a visa denial. *Hawaii*, 138 S. Ct. at 2419. Due process requires only "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted); *Gebhardt*, 879 F.3d at 988 (dismissing a due process claim as a matter of law because "Plaintiff has not pointed to a deficiency in USCIS's *process* at all. Rather, Plaintiff's 'due process claim' essentially rehashes the arguments against the substantive standards . . .") (emphasis original).

In *Hawaii*, the Court reaffirmed that, to the extent a U.S. citizen has any due process rights to assert with respect to a family member living abroad, the government provides all the process that is due by giving a statutory citation to explain a visa denial. 138 S. Ct. at 2419. Thus, due process principles are generally not applicable to federal government action related to adjudication of visa applications, and even when they are, they are easily satisfied. The Supreme Court has allowed a "circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen." *Hawaii*, 138 S. Ct. at 2419. However, "[g]iven the authority of the political branches over admission," this exception is narrow: "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its

justification" against the asserted constitutional interests of U.S. citizens. *Id.* (quoting *Mandel*, 408 U.S. at 770). While the Court in *Hawaii* acknowledged that *Mandel*'s "narrow standard of review" has particular force in cases that implicate national security concerns, this circumscribed judicial inquiry is not limited to such cases. *Hawaii*, 138 S. Ct. at 2419. The Court cited multiple opinions applying and affirming this "deferential standard of review across different contexts and constitutional claims," including cases where no national security concerns were raised. *Id.* (citing *Fiallo*, 430 U.S. at 795). In *Fiallo*, the Court "applied *Mandel* to a 'broad congressional policy' giving immigration preferences to mothers of illegitimate children," and explained that "it is not the judicial role in cases of this sort to probe and test the justifications" of immigration policies. *Id.* at 795, 799. The Court specifically rejected the argument that the Court's deferential standard of review in prior immigration cases was limited to cases involving groups of aliens "perceived to pose a grave threat to the national security." *Id.* at 796.

Here, none of the Plaintiffs are asserting a claim seeking an explanation for a visa denial, *Hawaii*, 138 S. Ct. at 2419, and Plaintiffs fail to identify any deficiency with respect to the process by which the Proclamation was issued or implemented. *See Gebhardt*, 879 F.3d at 988. Thus, even assuming that Plaintiffs have a constitutionally protected liberty or property interest, they have received all the process they are entitled to. *See id.*

5.  **As a matter of law, Plaintiffs fail to state a Fifth Amendment claim for equal protection (Count II).**

Plaintiffs also assert an equal protection claim under the Fifth Amendment. "[W]hile the Fifth Amendment contains no equal protection clause it does forbid discrimination that is so unjustifiable as to be violative of due process." *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638, n.2 (1975). The Fifth Amendment's guarantee of equal protection mirrors the equal protection rights provided by the Fourteenth Amendment. *Id.*

Plaintiffs' claim fails at the threshold level because the Fifth Amendment does not apply to aliens outside the United States. *See Verdugo-Urquidez*, 494 U.S. at 269 (explaining that the Court has "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States.") (citing *Eisentrager*, 339 U.S. at 770, 784). Thus, the only Plaintiffs in this action who can even potentially assert an equal protection challenge to the Proclamation are those Plaintiffs who are U.S. citizens and lawful permanent residents inside the United States that are petitioning on behalf of a spouse or family member in another country. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1354 (D.C. Cir. 1997) (recognizing that under *Verdugo-Urquidez* an "equal protection claim must be asserted, if at all, by the citizen sponsors of the migrants").

But an equal protection challenge by the Plaintiffs inside the United States necessarily fails because none of these Plaintiffs assert that they were treated differently than similarly situated individuals. *See Legal Assistance*, 104 F.3d at 1354; *Cleburne Living Ctr.,* 473 U.S. at 439 ("Equal Protection ... commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike") (citations omitted). In the absence of any claim of distinction having been made based on "race, alienage, or natural origin," and none is asserted in this litigation, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne Living Ctr.,* 473 U.S. at 440 (analyzing the Equal Protection Clause of the Fourteenth Amendment).

For example, the D.C. Circuit found that an equal protection challenge to a change in the State Department consular venue policy that allegedly disadvantaged migrants originally from Vietnam and Laos failed as a matter of law because the policy did "not depend on the national

origin of the sponsor" of the immigrant petition. *See Legal Assistance*, 104 F.3d at 1354. While one could assume that a petitioner asserting a familial relationship with respect to a migrant "will more often than not be of Vietnamese or Laotian origins, the State Department does not require this to be the case." *Id*. As a result, there was no basis for a petitioner to assert an equal protection challenge. *See id*.

This holding applies with even greater force here, because the COVID-19 Labor Proclamation does not treat any group of foreign nationals seeking admission differently based on their nationality. Rather it treats all similarly situated petitioners and visa applicants the same. For example, although many of the Plaintiffs inside the United States are petitioning on behalf of spouses and family members living in non-European countries, Plaintiff Petrache is petitioning on behalf of his mother who is a citizen of Romania. Am. Compl. ¶ 16. There is no allegation that he is being treated differently, in any way, from the other Plaintiffs inside the United States.[1] Instead, Plaintiffs' argument rests on their allegations that most family-based visa immigrant applicants in recent years have originated in Asia, Africa, and South America and that most diversity visa selectees have originated from Africa and Asia. *See* Am. Compl. ¶ 106. But *Legal Assistance* stands for the proposition that this type of "more often than not" equal protection argument "has no merit." *See Legal Assistance*, 104 F.3d at 1350, 1354. As a result, Plaintiffs' due process challenge fails as a matter of law.

Moreover, to the extent that Plaintiffs can raise any equal protection challenge, such a challenge would fail under the *Mandel* standard because the Proclamation is supported by facially legitimate and bona fide purposes. *See Hawaii*, 138 S. Ct. at 2420 ("A conventional application of

---

[1] The Government notes that all of the Plaintiffs outside the United States are seeking diversity visas from European countries. *Id*. at ¶¶ 18, 19.

*Mandel,* asking only whether the policy is facially legitimate and bona fide, would put an end to our review") (discussing *Mandel*, 408 U.S. at 770). The Proclamation was issued in large part to address the rising unemployment rate caused by the COVID-19 virus and the policies that have been put in place to mitigate the spread of the virus that have damages the U.S. economy. 85 Fed. Reg. 23,441. The President determined that "without intervention, the United States faces a potentially protracted economic recovery with persistently high unemployment if labor supply outplaces labor demand." *Id*. In addition to these labor impacts, the Proclamation addresses other harms. First, "introducing additional permanent residents when our healthcare resources puts strain on the finite limits of our healthcare system . . ." *Id*. Second, the Proclamation recognizes burdens abroad on the State Department and the need to "conserve critical State Department resources so that consular officers may continue to provide services to United States citizens abroad." *Id*.; *see Nguyen,* 2020 WL 2527210, at \*2-\*3 (discussing the purposes behind the Proclamation).

Nowhere in the Amended Complaint do Plaintiffs argue that these purposes are not facially legitimate. To the extent Plaintiffs' argument is that this Court should look behind the text of the Proclamation to consider external statements, this argument has already been rejected by the Supreme Court. *See Hawaii*, 138 S. Ct. at 2417-2418, 2420; *see, e.g., International Refugee Assistance Project v. Trump ("IRAP")*, --- F.3d ---, 2020 WL 3039029 (4th Cir. June 8, 2020) (reversing and ordering dismissal because the district court relied on external statements in determining whether plaintiffs stated a claim for purposes of Rule 12(b)(6)).

Lastly, to the extent that any further equal protection review of the Proclamation is permitted, this Court should dismiss Plaintiffs' equal protection challenge because the Proclamation is supported by a rational basis. *See Hawaii*, 138 S. Ct. at 2420 (assuming, without deciding, that if Court could review the presidential proclamation notwithstanding *Mandel* then

that review would be under the rational basis standard); *IRAP*, 2020 WL 3039029, at *12 (stating "to the extent that the plaintiffs' constitutional claims are subject to rational basis review, rather than the *Mandel* standard, the district court should have dismissed them for failing to state a claim to relief that is plausible on its face"). Under rational basis review, the Court "hardly ever strikes down a policy as illegitimate . . ." *Hawaii*, 138 S. Ct. at 2420. This is because rational basis review requires the challenger to show that the statute or policy is not a rational means of advancing a legitimate government purpose. *Hettinga v. United States*, 677 F.3d 471, 478–79 (D.C. Cir. 2012); *see also Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 487–88 (1955) ("It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it"). Even at the motion to dismiss stage, a plaintiff alleging an equal protection violation must plead facts that establish that there is not "any reasonable conceivable state of facts that could provide a rational basis for the classification. *Hettinga*, 677 F.3d at 479. Moreover, in traditional equal protection contexts, the subjective motivations of the government actor are not considered. *See*, *e.g.*, *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 77 (D.D.C. 2015) citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."); *Women Involved in Farm Econ. v. U.S. Dep't of Agric.*, 876 F.2d 994, 1005 (D.C. Cir. 1989) ("Ordinarily, there is no necessity in rational-basis scrutiny for a separate inquiry into the legislature's *actual* motivation, for the legislature's subjective motivation does not undermine a classification's validity provided legitimate motivations are conceivable.") (emphasis in original)).

Here, as set forth above, the Proclamation is supported by several rational bases, *see* 85 Fed. Reg. 23,441, and Plaintiffs do not contend otherwise in their Amended Complaint. To the extent Plaintiffs' argument it that the COVID-19 Labor Proclamation is irrational because it is either too broad in scope or too narrow in scope, such an argument is not a proper basis for challenging a statute or policy under rational basis review. *See Lee Optical*, 348 U.S. 483, 487–88. In sum, Plaintiffs cannot state a claim under the equal protection component of the Fifth Amendment. *See Iqbal*, 556 U.S. at 678 (holding that "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (citations and quotations omitted); *IRAP,* 2020 WL 3039029, at *13 (explaining "we completely fail to see how the plaintiffs' claims could possibly — let alone plausibly — survive rational basis review").

## CONCLUSION

WHEREFORE, for the reasons set forth above, Plaintiffs' Amended Complaint should be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure, or, in the alternative, under Rule 12(b)(6) for failure to state a claim.

Date:   June 8, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

WILLIAM C. PEACHEY
Director

GLENN M. GIRDHARRY
Assistant Director

By: *s/ Aaron S. Goldsmith*
AARON S. GOLDSMITH
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4107
Fax: (202) 305-7000
Email: aaron.goldsmith@usdoj.gov

Counsel for Defendants

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on June 8, 2020, I electronically filed the foregoing document with

the Clerk of the Court by using the CM/ECF system, which will provide electronic notice and an

electronic link to this document to all attorneys of record.

By: <u>*s/ Aaron S. Goldsmith*</u>
AARON S. GOLDSMITH
Senior Litigation Counsel
United States Department of Justice
